UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

IRENE MADRIGAL,

  Plaintiff,

  v.                                    Case No. 19-C-1349

ANDREW M. SAUL,
**Commissioner of Social Security,**

  Defendant.

---

## DECISION AND ORDER

---

Irene Madrigal seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons set forth below, the Commissioner's decision will be affirmed.

### BACKGROUND

The plaintiff's disability claim is based on fibromyalgia, back pain, pulmonary embolism, asthma, and obesity. She alleged disability beginning September 1, 2014, when she was forty-nine years old. After the Commissioner denied her claim initially and on reconsideration, the plaintiff appeared before an administrative law judge (ALJ) on September 10, 2018. R. 13.[1] The ALJ issued an unfavorable decision and the Appeals Council denied the plaintiff's request for review.

---

[1] The transcript is filed on the docket at ECF No. 13.

At the time of the hearing, the plaintiff was 254 pounds (at a height of 5'4"), explaining that her elevated weight was due in part to medications, although she was not gaining "massive amounts" because of them. R. 36. She lived in the lower level of a duplex along with her two teenaged sons, her thirty-five-year-old daughter, and her daughter's five children, whose age ranged from one month to thirteen years old. R. 37. The plaintiff testified that a routine day involved waking around 5:00 a.m., and then lying in bed for a bit "because it takes me a while to move around." R. 40. She would then shower and get the children up, make breakfast, and then drive them to school around 7:15. If she had a "rough night," she'd rest during the remainder of the day due to pain. But if she'd had a good evening, she might start a load of laundry. She explained: "[i]t all depends on my body, what it's doing that day." R. 40.

The plaintiff explained that flare-ups of fibromyalgia could "take [her] out for a couple of days. So, I try and limit myself to what I'm doing for the day, not to over-exert myself." R. 40. In addition, she said she often experienced chest pain due to pulmonary embolisms; she stated that "it kind of all combines together, kind of takes its toll." R. 41. Her hobbies included making stuffed pillows, reading books, and visiting a friend for lunch occasionally. She stated that she could not watch movies because she couldn't sit for long enough to get through an entire movie. R. 41-42. Later in the hearing, she stated that she attended her sons' soccer games, although she was usually unable to stay for the entire game due to the difficulty of sitting in the bleachers. R. 66. She was also active in the soccer booster club, attending spaghetti dinners on Wednesdays and working the concession stand during games, although usually just for forty-five-minute intervals. R. 69. In addition, her family went camping in tents near Shawano, Wisconsin, which she said was less than an hour from her home. R. 70.

She did not travel much beyond that in recent years, particularly on airplanes, because the elevation affected her chest. R. 70.

The plaintiff's relevant past work included a supervisory position in the Walgreen's photo department. R. 43. She stated that she had to be on her feet the whole shift, and was expected to lift canisters, unload trucks, and run the machines that developed photos. At one point, she said, her physician wrote a note explaining that she should not be asked to lift more than twenty pounds. R. 44.

On examination by her attorney, she summarized her case as follows:

> I cannot work due to my fibromyalgia flare-ups, along with my back. And, I don't have the strength to lift anything. I can't sit long periods of time because it's hard for me to get back up and moving. Can't kneel; knees are going bad. And, I can't do a lot of walking, due to the pulmonary embolisms that I've had. It takes a lot out of me.

R. 47. She also added that she was short of breath most of the time due to asthma and her pulmonary embolisms. This required her to take a one-minute break whenever she would need to walk somewhere. R. 48-49. In addition, she said that even sitting still during the hearing caused pain in her back, and that there were no postural positions, including lying down, that were comfortable for her. R. 52-53. Standing was the worst: if she needed to wash dishes, for example, she put one foot on a stool "to try and alleviate so much pressure on my back." R. 53. Her family, she said, helped around the house with chores, as well as with things like putting on socks and other clothing. R. 55. For treatment, she took Lyrica, which she said was not available when she was first diagnosed ten years earlier. The Lyrica "helps," and she is on higher doses than previously, but she still had "pretty bad flare-ups." R. 57. She said the flare-ups were usually caused by being overactive one day: "I feel it the next day . . . and, the day after." R. 57-58. She testified that she definitely had at least three flare-ups per week, and

3

sometimes four. R. 58. Just four years earlier, she would only experience about one flare-up per week. R. 61.

The plaintiff explained that she had stopped working initially due to a pulmonary embolism, which took her out of service for a year. R. 62. After she returned, she only lasted about six months due to pain in her chest and back, as well as an inability to lift much weight or to do as much with her hands on the store's computer system. R. 62. As for her mental health, she explained that although she had usually tried to put on a "happy face," she had been diagnosed with major depressive disorder. R. 62. Her depression sometimes caused her to isolate herself from her family and lock the door. R. 66.

A vocational expert testified at the hearing. The ALJ asked the expert whether an individual with the ability to perform light work would be able to perform the plaintiff's past work if she were restricted from climbing ladders, ropes, or scaffolds; avoiding exposure to fumes, dust, heat, extreme heat, cold, etc.; and limited to only occasionally climbing stairs, stooping, or crouching. R. 72. The expert believed that this hypothetical individual could perform the plaintiff's past work, as well as other jobs, such as cashier, mail clerk, and housekeeper maid. R. 72-73. The ALJ then asked whether these jobs, or the plaintiff's past work, would be available if the individual required the ability to sit or stand, a "true sit/stand option." R. 73. The VE stated that the plaintiff's past work would be excluded (she had testified that she was on her feet all day). In addition, a sit/stand option would eliminate the light-work jobs the VE had cited and would limit the hypothetical individual to performing sedentary work. R. 73.

The ALJ's decision found that the plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, asthma, fibromyalgia, obesity, and history of

4

pulmonary embolism. R. 15. And, although the ALJ considered the plaintiff's mental health status, the ALJ concluded that her depression and anxiety did not cause more than minimal limitation in her ability to perform basic work activities. R. 16. At step three, the ALJ concluded that the evidence did not support a finding that the severity of any of the plaintiff's symptoms, either singly or in combination, was sufficient to meet any of the listings. R. 17-18. The ALJ concluded that the plaintiff retained the residual functional capacity (RFC) to perform light work with the following limitations: no climbing ladders, ropes, or scaffolds; occasional climbing of stairs, stooping, or crouching; avoid exposure to fumes, dusts, odors, gases, or similar pulmonary irritants, as well as exposure to extreme heat and cold. R. 18-19. The ALJ found, at step four, that the plaintiff could perform past work as a department manager, and, at step five, that she was capable of adjusting to other work that exists in significant numbers in the national economy. R. 23.

In reaching this decision, the ALJ concluded that the medical records failed to fully substantiate the plaintiff's allegedly disabling symptoms; the ALJ also found that the plaintiff's reported activities suggest that she has greater abilities than she alleged. R. 19. As relevant here, the ALJ did not credit the plaintiff's claim that her fibromyalgia flares precluded her from working. First, the ALJ found that medical records showed that the plaintiff retained normal range of motion, muscle tone, coordination, and gait. R. 21. She has been treated with Lyrica, the ALJ noted, and there is no indication that her providers have placed restrictions on her physical activity due to fibromyalgia. R. 21. Moreover, the treatment records do not document significant complaints of fibromyalgia symptoms. The ALJ also noted that the plaintiff had a ten-year history of fibromyalgia and yet was able to perform her Walgreen's job through much of 2014. Finally, her activities suggest she is able to do more than she

alleges: she attends soccer games, participates in the parent booster club, attends spaghetti dinners, and works a forty-five-minute shift at the concession stand. R. 21. In addition, she provides care for her young grandchildren, wakes her children and drives them to school, and goes camping with some frequency. Given these activities, the ALJ found that "she has remained able to engage in a number of normal day-to-day activities, many of which involve at least a light level of exertion." R. 21.

## ANALYSIS

### 1. Applicable Legal Standards

The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported [her] decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from the evidence to [her] conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citing *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

The ALJ is also expected to follow the Social Security Administration's (SSA) rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See Prochaska*

*v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### 2. Evaluation of the Plaintiff's Fibromyalgia

The plaintiff's principal argument on appeal is that the ALJ improperly evaluated her limitations due to fibromyalgia. SSR 16-3p requires that an ALJ must give "specific reasons for the weight given to the individual's symptoms" that are "consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual symptoms." The plaintiff concedes that the ALJ followed the regulation in offering reasoning regarding the plaintiff's subjective complaints. However, the plaintiff believes the ALJ erred by not considering the unique nature of fibromyalgia.

Fibromyalgia is characterized by inflammation of the connective tissue in muscles: it has been described as

> a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms. The word 'fibromyalgia' comes from the Latin term for fibrous tissue (fibro) and the Greek [terms] for muscle (myo) and pain (algia). ... [F]ibromyalgia can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities.

*Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1136–37 (7th Cir. 2017) (citation omitted). The Seventh Circuit has described it as "a common, but elusive and mysterious,

7

Case 2:19-cv-01349-SCD   Filed 04/29/20   Page 7 of 15   Document 22

disease, . . . of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia." *Sarchet*, 78 F.3d at (7th Cir. 1996). The principal symptoms of fibromyalgia are "pain all over," fatigue, disturbed sleep, stiffness, and multiple tender points. *Id.*

The key for present purposes is the fact that there are no laboratory tests for fibromyalgia and the symptoms are entirely subjective. *Id.* As the plaintiff points out, "[w]hat is unusual about the disease is that those suffering from it have muscle strength, sensory functions, and reflexes that are normal. Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling." *Revels v. Barnhart,* 874 F.3d 648, 656 (9th Cir. 2017). The upshot of this is that if a claimant has a medical exam that otherwise appears "normal," that result does not say much, if anything, about the claimant's fibromyalgia; in other words, appearing "normal" is part and parcel of the disease. It could therefore be error for an ALJ to discount a claimant's fibromyalgia on the basis of normal test results. *See, e.g., Sandra R. W. v. Comm'r of Soc. Sec.,* No. 18-CV-089-CJP, 2018 WL 5717202, at *6 (S.D. Ill. Nov. 1, 2018) ("The ALJ pointed out that plaintiff was seen for fibromyalgia-related joint pain in September 2014, but her sedimentation rate (ESR) was normal. However, ESR is not a test for fibromyalgia and a normal ESR does not cast doubt on a diagnosis of fibromyalgia.")

Here, the ALJ appeared to discount the plaintiff's fibromyalgia symptoms by referencing normal, objective tests: "[s]he testified that she experiences 3 to 4 flares in fibromyalgia per week, which are triggered by increased movement. However, as noted above, the claimant's medical records reflect that she retained normal range of motion, muscle tone coordination, and gait." R. 21. The plaintiff is correct that having a normal gait would

not necessarily preclude a diagnosis of fibromyalgia, nor would it speak to the frequency or degree of her symptoms, particularly if the exam occurred when she was not experiencing a flare. "It is irrelevant to look at test results showing a normal and steady gait to discount an RFC opinion by a treating physician because it was based on reports of fibromyalgia pain." *Jacobs v. Berryhill*, No. 16-CV-408-WMC, 2018 WL 1557252, at *2 (W.D. Wis. Mar. 30, 2018). However, it is not true that *all* test results are categorically irrelevant to the fibromyalgia analysis. In *Sandra R.W., supra,* the ALJ improperly relied on an objective test despite the fact that the test did not cast any doubt on the plaintiff's diagnosis—the result was essentially irrelevant, just as an MRI or a blood test would be. 2018 WL 5717202, at *6. Here, by contrast, an individual's performance in physical measures of ability, such as a range-of-motion test, is at least arguably relevant to her claim of debilitating pain; put another way, an individual with a normal range of motion is (other things being equal) less likely to have significant limitations due to pain than someone who demonstrated a limited range of motion (perhaps due to pain caused by fibromyalgia). Although it is true that lab tests and scans like x-rays will not be of any use, the plaintiff has not cited any cases finding reversible error where an ALJ cited *ability* tests evaluating the claimant's range of motion. Although the range-of-motion test cited by the ALJ is admittedly of very limited probative value and would not on its own warrant the ALJ's conclusions, it was not erroneous for the ALJ to refer to it.

More importantly, the ALJ relied on several other factors in considering the plaintiff's fibromyalgia. The ALJ cited medical records indicating that the plaintiff had denied weakness and fatigue. R. 368. It is true that, as the plaintiff argues, this was a single record stemming from an asthma appointment, and so on its own this solitary record does not count for much. But the ALJ also found that "there is no indication that the claimant's treating providers

9

placed restrictions on her physical activity due to fibromyalgia." R. 21. In other words, it's not only what's *in* the medical records, but what *isn't,* and the ALJ is correct that there is a dearth of any discussion of limitations in the medical record.

The plaintiff protests that there are records indicating worsening pain due to fibromyalgia. For example, a treatment record from April 12, 2016 notes she was taking tramadol 50 mg for worsening fibromyalgia pain. R. 543. But the ALJ's statement was that there was no evidence in the record that her providers had placed *restrictions* on her physical activity, not that there was no evidence of pain at all. R. 21. The plaintiff also argues that the record shows she was trying multiple therapies for fibromyalgia, adding tramadol to the Lyrica she had previously been taking. R. 608. Although this is true, the fact that she was being treated with prescription drugs for fibromyalgia does not speak to the level of limitation caused by her fibromyalgia. *See Sarchet*, 78 F.3d at 306-07 ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [the claimant] is one of the minority.")

The ALJ also considered the plaintiff's activities, finding it relevant that she attended soccer games, spaghetti dinners, and retained the ability to work forty-five-minute shifts at the concession stand. R. 21. She also cared for her children and young grandchildren, including driving them to school, performed household chores such as laundry, and she reported "a lot of camping." R. 21, citing R. 461. She had also reported to one of her physicians taking a yearly trip to Mexico "for 1-3 months every year." R. 461. The ALJ further observed that despite having a ten-year history of fibromyalgia, the plaintiff had managed to work through most of 2014. The plaintiff had explained that it was easier to work through the pain when

10

she was younger, R. 57, but the medical record does not demonstrate "significant complaints due to fibromyalgia." R. 21.

Ultimately, although the record provides evidence that the plaintiff was being treated for fibromyalgia, the ALJ is correct that the record does not contain much evidence that the plaintiff's fibromyalgia limited the plaintiff's activities as substantially as she asserted. Nor has the plaintiff pointed to substantial support in the medical record indicating that she would be precluded from working due to fibromyalgia. Thus, although the plaintiff is correct that the ALJ improperly considered one or more normal results from objective tests in discounting the plaintiff's symptoms, the ALJ provided several cogent and substantial reasons for concluding that fibromyalgia was not a disabling condition for the plaintiff. *See Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) (citations omitted) ("Not all of the ALJ's reasons must be valid as long as enough of them are.").

### 3. Sit-Stand Option

The plaintiff also argues that the ALJ should have included a sit/stand option in the plaintiff's residual functional capacity. At the hearing, the ALJ asked the vocational expert whether a "true" sit/stand option would preclude the plaintiff's past work. It would. R. 73. The vocational expert also said that adding a sit/stand requirement to the position would eliminate the light-work jobs the VE had identified (cashier, mail clerk, and housekeeper maid). Instead, the only appropriate jobs with a sit/stand option would be sedentary jobs. R. 73. The ALJ appeared to "step away from" the sit/stand option for the moment and pivoted to questions involving sedentary work. R. 73. The VE stated that the plaintiff's past work (which was light) would not be available at the sedentary level, and he further testified that any skills acquired from that past work would not be transferrable to applicable jobs at the

11

sedentary level. R. 73-74. To summarize: no light-work jobs having a sit/stand option were identified at the hearing.

In crafting the RFC, the ALJ did not impose a sit/stand option, but neither was the RFC silent on the plaintiff's ability to stand. The ALJ's RFC finding indicates that "insofar as the claimant may need to alternate sitting and standing, this is accommodated by the normal mix of sitting, standing, and walking involved in light work, including routine breaks." R. 22. The plaintiff now argues the ALJ erred in failing to build a strict sit/stand option into the RFC. The ALJ clearly seemed to recognize the plaintiff's need to have the ability to sit and stand, but nevertheless indicated merely that the "normal mix" of sitting and standing inherent in light work would suffice to accommodate any need. The plaintiff notes that many light work jobs—including her past work and the jobs identified by the vocational expert—do *not* allow for a sit/stand option, and so the plaintiff argues that the ALJ's belief that light work would accommodate the plaintiff must be erroneous.

Crucially, there is a difference between a claimant who requires a sit/stand option and a claimant who would be unable to stand for more than six hours per day. The former would need the ability to sit and stand whenever she wanted, while the latter would merely need to sit at several periods throughout the workday, albeit not at her own option. *See, e.g., Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("Schmidt argues that the ALJ's analysis was deficient because he did not specify the frequency with which [the claimant] would need to alternate between sitting and standing. We find Schmidt's contention unavailing, however, because the ALJ did restrict Schmidt to work that allowed her an opportunity to sit or stand at her 'own option.'") Taken to its logical extension, such an employee could opt to sit for 100% of her workday. Necessarily, granting that much flexibility to an employee could

12

dramatically decrease, or erode, the number of available jobs. "The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand." SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996) (discussing erosion with sit/stand restrictions in sedentary jobs).

Here, by contrast, the ALJ did not find that the plaintiff needed to be able to sit or stand *at will*. Instead, the ALJ seems to have categorized the plaintiff as someone who would be unable to stand for an entire eight-hour shift and who would need *some* ability to sit during the day, even if not necessarily at periods of her own choosing. Given that limitation, the ALJ noted that the normal mix of sitting, standing, and walking inherent in light work, including routine breaks, would suffice. R. 22. This was not error. The ALJ's recognition that the plaintiff would need to sit at times does not mean either that the ALJ believed the plaintiff required a true sit/stand option, nor that the evidence in the record would require such an option. Most tellingly, the plaintiff has not identified any source in the medical record that would require the plaintiff to have a job that allowed her to sit or stand at her own will.

Although the plaintiff does not argue that the ALJ should have included some kind of standing limitation in the RFC (apart from the full sit/stand option), she seems to suggest that light work jobs would be inappropriate for her. Light-work jobs do not require constant standing or walking, however. The regulations define light work as work that requires the ability to lift ten pounds frequently and twenty pounds occasionally as well as "a good deal of walking or standing." 20 C.F.R. § 404.1567(b). SSR 83-10 further explains that light work "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." 1983 WL 31251, at *5 (January 1, 1983). In fact, the vocational expert identified available light-work jobs including cashier and mail clerk, and it is not difficult to envision

13

these jobs being performed by someone who could stand or walk far *less* than six hours per day. In a case from the Northern District of Illinois, for example, a vocational expert testified that "cashier, storage facility rental clerk, and routing clerk jobs . . . did not require more than four hours of standing or walking." *Bradley v. Colvin*, No. 15 C 8107, 2016 WL 5928811, at \*16 (N.D. Ill. Oct. 11, 2016). In addition, "the VE also added that an employee who was limited to only two hours of standing or walking in a workday would be able to perform the jobs of cashier, storage facility rental clerk, and ticket taker." *Id.*; *see also Thompson v. Colvin*, 2015 WL 1476001, at \*5 (C.D. Cal. Mar. 31, 2015) (the job of mail clerk could be done spending only two hours standing or walking).

In *Jackson v. Berryhill*, 2017 WL 4773314, at \*9 (M.D.N.C. Oct. 20, 2017), the plaintiff argued that she could not perform light-work jobs such as mail clerk because her RFC limited her to four hours of standing per day. The court rejected the argument, noting that it was a "faulty premise" that "light work" required standing up to six hours per day. *Id.* at \*8. Instead, the "unskilled, light occupational base contains some light jobs that do not contain a substantial standing and/or walking requirement." *Id.* (citing 20 C.F.R. § 416.967(b)). The court also found that the Dictionary of Occupational Titles' job descriptions "list many activities that a worker can perform while seated," including the job of mail clerk: a "mail clerk sorts incoming mail, opens envelopes, stamps the date and time of receipt on mail, folds letters and inserts them into envelopes, and addresses, weighs, and stamps outgoing mail." *Id.* at \*9 (citing DOT No. 209.687–026 (Mail Clerk), 1991 WL 671813). Here, even if the ALJ had imposed a significant standing restriction in the plaintiff's RFC, light-work jobs such as cashier or mail clerk would have remained available.

14

In sum, the ALJ recognized that the plaintiff would be unable to stand for an entire workday, and the RFC therefore reflected that fact by pointing out that light-work jobs allow for less than a full day of standing. The fact that such jobs might not have a sit/stand option does not mean the plaintiff is unable to perform them.

## CONCLUSION

The decision of the Commissioner is affirmed. The clerk will enter judgment accordingly.

**SO ORDERED** this 29th day of April, 2020.

STEPHEN C. DRIES
United States Magistrate Judge